Spain, J.
Appeal from a judgment of the County Court of Albany County (Breslin, J.), rendered September 1, 2010, upon a verdict convicting defendant of the crime of rape in the first degree.
This case, which began with a consensual relationship and ended in defendant’s indictment on a single count of rape in the first degree (see Penal Law § 130.35 [1]), presents a classic he-said she-said credibility determination. After a jury trial, defendant was convicted and sentenced as a second felony offender to a prison term of 22 years and five years of postrelease supervision. Defendant appeals and we now affirm.
We turn first to defendant’s argument that the verdict was against the weight of the credible evidence, necessitating a full review of the testimony adduced at trial. Many details are undisputed. Defendant, then 40 years old, first met the victim—an 18-year-old woman with an extensive history of psychiatric problems—at a bus stop in the City of Albany in April 2009. They talked extensively about various topics, including sex, while walking together until they eventually visited a recreational vehicle that belonged to a friend of defendant. The victim testified that, while inside the vehicle, defendant gave *1001 the victim a back massage, but nothing else happened of an intimate nature. Defendant’s version of these events differed only in that he testified that, following the massage, the victim engaged in oral sex with him. Upon parting that night, the victim gave defendant her telephone number and they spoke on the telephone a few times in the weeks ahead. On May 26, 2009, defendant called the victim and invited her out for the evening. The victim’s mother drove her to defendant’s residence, where the victim met members of defendant’s family, and she then dropped the pair off on Lark Street. They walked around for a while and stopped at the home of defendant’s friend, Marvin Calhoun, where they visited with Calhoun and his family. The victim admits that she exchanged sexual innuendos with defendant during this visit. After a few hours, the couple left, ending up at the apartment of another one of defendant’s friends, Kevin Johnson, where they engaged in consensual kissing and fondling.
It is at this point that the testimony of defendant and the victim sharply diverges. The victim testified that after about 15 minutes, defendant wanted to have intercourse but she refused, telling him it was too soon in their relationship. When defendant continued to insist, she became angry with him and left the apartment. Defendant caught up with her on a street outside the apartment and apologized to her. She stated that they continued to argue while they walked, but that she tired of walking so they sat down. The victim stated that, while seated, they witnessed police officers draw their weapons on a young female with a baseball bat. She explained that this incident made both her and defendant laugh, and she no longer felt angry with him.
Defendant testified that the victim had unsuccessfully asked Calhoun if they could use a bedroom to have sex while visiting Calhoun’s family and, once at Johnson’s apartment, she initiated sex and it was he who refused to have intercourse there because he thought it was not appropriate to have sex on the couch with his friend in the next room. He testified that they left the apartment together in search of another place to have sex, and that the victim was willing even to have sex outside in the bushes. Defendant further stated that the victim was not angry with him when they left Johnson’s apartment and that they never witnessed the police encounter with the female with the baseball bat.
By both accounts, the couple eventually ended up at an abandoned house located at 595 Clinton Avenue in Albany, where the victim followed defendant through the backyard into *1002 the house. At this point, the accounts of the victim and defendant again diverge. The victim testified that defendant backed her up against a wall and started to forcibly kiss and grind against her. She testified that she pushed him away and told him to stop, but that he continued, telling her, “You are going to give it to me or I’m going to take it.” The victim stated that they struggled; she punched defendant in the face, near his jaw or chin, and defendant hit her in the face several times and choked her. While he was choking her from behind, the victim testified, she was able to bite his forearm. After an extended struggle, during which the victim tried to make noise to draw attention and begged for her life, she gave up and submitted to sexual intercourse with defendant. The victim stated that, when it was over, defendant did not prevent her from leaving, but told her, “Don’t go out there looking like that.” The victim stated that she wiped the tears and blood off of her face onto her shirt, then went out the same way they had entered. She further testified that she got caught on a fence while trying to leave, and ripped her shirt. She came upon a pay telephone and called 911. Police officers arrived and she was brought to the hospital for examination. The victim’s torn shirt and photographs of her bruised face were admitted in evidence at trial.
By contrast, defendant testified that the couple had consensual intercourse once inside the abandoned building. He explained that after they were through and he asked the victim if she wanted to go home, she suddenly demanded money from him and, when he refused, grabbed his pants and began to leave. Defendant stated that he then tackled the victim to prevent her from leaving and her face struck the floor as they fell. They then struggled as he attempted to pry his money—which the victim had by then extracted from the pocket of his pants— from her hand and, during the struggle, she bit his arm. According to defendant, he eventually managed to squeeze the victim’s hand open and retrieve his cash, at which point the victim got up and left the building.
Defendant then went to the home of his friend, James Close, where, according to Close, he pounded on the door, yelling for admittance. Close testified that defendant looked like he was being chased by someone and implied that he wanted to come inside because there was a female outside who was exposing herself to defendant. Defendant testified that he went to Close’s house because he wanted to tell him about his encounter with the victim but, suddenly realizing that the abandoned house he had been trespassing in might belong to Close, changed his mind and left. He explained that he might have referred to the *1003 victim as “the girl [who] lifted her shirt up on Central Avenue that time” because he had told Close about his first meeting with the victim and that she had exposed herself on the street that night to some passers-by.
Based on this evidence, it would not have been unreasonable for the jury to believe defendant’s testimony that the sexual encounter was consensual.[1] Thus, to determine if the verdict was against the weight of the evidence, we “ ‘must, like the trier of fact below, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony’ ” (People v Terry, 85 AD3d 1485, 1486 [2011], lv denied 17 NY3d 862 [2011], quoting People v Romero, 7 NY3d 633, 643 [2006]), while giving due deference to the credibility determinations of the jury (see People v Wright, 81 AD3d 1161, 1163 [2011], lv denied 17 NY3d 803 [2011]). Defendant, both in counsel’s brief and in his pro se submission, relies on inconsistencies in the victim’s testimony, her mental health history and his interpretation of the physical evidence and testimony adduced at trial to argue that the verdict is against the weight of the credible evidence. Examining all his arguments and the proof adduced at trial, we find no legal basis for substituting a different conclusion from that reached by the jury.
Defendant focuses on the fact that a hospital record states that the victim reported to medical personnel that the attack lasted three minutes, while she testified that they struggled for 30 to 45 minutes. A review of that record, however, suggests that the time reported may refer to the duration of the rape, as opposed to the entire struggle. Further, defendant emphasizes the fact that, according to a hospital record, the victim first reported that there was some consensual kissing at the abandoned house, but thereafter testified that the kissing was also against her will. We do not find this inconsistency to be evidence that the victim’s testimony is fundamentally unreliable; she was cross-examined on this at trial, thus putting the credibility determination squarely in front of the jury. Faced with inconsistencies, “the jury ‘was entitled to credit some of her testimony while discounting other aspects’ ” (People v Hoppe, *1004 96 AD3d 1157, 1159 [2012], lv denied 19 NY3d 1026 [2012], quoting People v Kuykendall, 43 AD3d 493, 495 [2007], lv denied 9 NY3d 1007 [2007]; see People v Alteri, 49 AD3d 918, 920 [2008]). Likewise, defendant’s assertion on appeal—that the victim’s testimony that they witnessed police officers draw their weapons on a female carrying a baseball bat was incredible—is a decision appropriately left to the trier of fact.
Defendant also argues that the victim’s credibility is undermined by her mental illnesses. Evidence was presented at trial that established that the victim had a long history of mental illness; she had been diagnosed with epilepsy, posttraumatic stress disorder, Tourette’s disorder and bipolar disorder and, as a result of these conditions, she had been hospitalized more than 10 times in her 18 years. It is well settled that an individual suffering from mental illness may be competent to provide evidentiary testimony at trial (see People v Gelikkaya, 84 NY2d 456, 460 [1994]; People v Rensing, 14 NY2d 210, 213-214 [1964]). No proof was presented that the victim was unable to appreciate the nature of her oath (see People v Gelikkaya, 84 NY2d at 460), and the jury was aware of the victim’s diagnoses and was free to determine that she was, nevertheless, more credible than defendant (see People v Plaisted, 2 AD3d 906, 909 [2003], lv denied 2 NY3d 744 [2004]).
Nor do we find that the victim’s testimony was necessarily contradicted by the physical evidence. The victim’s injuries, which consisted of a bruise on her face, a cut inside her cheek and a scratch near her lip, coupled with the teeth marks on defendant’s forearm, were not so insubstantial as to render the victim’s description of the struggle implausible. The victim’s testimony was not incredible as a matter of law; rather, the conflicting testimony “presented ‘a classic credibility issue’ for the jury to resolve” (People v Mitchell, 57 AD3d 1308, 1309 [2008], quoting People v Allen, 13 AD3d 892, 894 [2004], lv denied 4 NY3d 883 [2005]; see People v Blackman, 90 AD3d 1304, 1308 [2011], lv denied 19 NY3d 971 [2012]).[2]
We turn next to defendant’s contention that County Court erred in refusing to turn over all of the victim’s mental health *1005 records. In general, mental health records are confidential and will not be discoverable where sought as “a fishing expedition searching for some means of attacking the victim’s credibility” (People v Brown, 24 AD3d 884, 887 [2005], lv denied 6 NY3d 832 [2006]; see People v Gissendanner, 48 NY2d 543, 550 [1979]; People v Bush, 14 AD3d 804, 805 [2005], lv denied 4 NY3d 852 [2005]). Access will be provided, however, where a defendant can demonstrate a good faith basis for believing that the records contain “data relevant and material to the determination of guilt or innocence,” a decision which will rest “largely on the exercise of a sound discretion by the trial court” (People v Gissendanner, 48 NY2d at 548; see People v Plaza, 60 AD3d 1153, 1154-1155 [2009], lv denied 12 NY3d 919 [2009]). Here, defendant requested all of the victim’s mental health records, based on the disclosure by the People that the victim has a history of mental illness, had been the victim of sexual abuse on at least three prior occasions and had attempted suicide in the months leading up to the trial.
Under these circumstances, County Court appropriately conducted an in camera review of the victim’s records and partially granted defendant’s request by turning over those records that the court found were pertinent to the case. In this manner, the court properly balanced defendant’s 6th Amendment right to cross-examine an adverse witness and his right to any exculpatory evidence against the countervailing public interest in keeping certain matters confidential (see People v Gissendanner, 48 NY2d at 549-551; People v Boyea, 222 AD2d 937, 938-939 [1995], lv denied 88 NY2d 934 [1996]; see also People v Fuentes, 12 NY3d 259, 263-265 [2009]). We have reviewed the victim’s voluminous mental health records and conclude that the court provided an appropriate sample of documents that covers all of the victim’s relevant and material mental health issues.
The dissent, in performing its review of the victim’s mental health records, has unearthed some documents that were not disclosed to defendant and are relevant to the victim’s competence to testify, in particular, references to short-term memory loss, such as her inability to recall events after she has had a temper tantrum, and a suggestion that she forgets good experiences with a person if they are succeeded by a negative experience. We find, however, that it was not an abuse of discretion for County Court to fail to disclose these documents. Indeed, given the limited impact these additional relevant records have when compared to the amount of material that was disclosed to the defense regarding the victim’s hallucinations, various *1006 diagnosed conditions, medications, preoccupation with sex, poor judgment, dangerous behaviors, self-abuse, violent outbursts, etc., we cannot find that County Court so failed in its diligent efforts to cull through thousands of pages of mental health records to balance the victim’s rights against defendant’s rights such as would constitute an abuse of discretion.[3]
Other documents that the dissent asserts should have been disclosed were redundant in light of those records that were disclosed. For example, additional documents relating to the victim’s poor perception and insight were properly withheld because the sample documents disclosed contain multiple references to her poor impulse control and lack of judgment, especially in sexual interactions and Internet exchanges. Likewise, the victim’s experiences with seizures and flashbacks were disclosed in documents turned over to the defense. An incident where the victim was found wandering on a highway and not able to remember how she got there was also noted in one of the documents that was disclosed.
Additionally, it was not necessary for County Court to disclose those few references in the victim’s mental health records that suggest that she may have falsely accused her father of sexually abusing her when she was 13. Assuming that the records contain enough information to suggest a false allegation,[4] this evidence would not be admissible under New York’s Rape Shield Law because it is far too different and attenuated from the circumstances of the present allegation of rape to “ ‘suggest a pattern casting substantial doubt on the validity of the charges made by the victim’ or ‘indicate a significant probative relation to such charges’ ” (People v Blackman, 90 AD3d at 1310 [citations omitted]; see People v Mann, 41 AD3d 977, 978-979 n *1007 [2007], lv denied 9 NY3d 924 [2007]). We detect no pattern of behavior by comparing this remote, alleged false claim of sexual abuse by the victim against her alcoholic, physically abusive father, with her assertion that she was date-raped by defendant (see People v Mandel, 48 NY2d 952, 953 [1979] [prior false allegations of rape inadmissible where “no showing was made that the particulars of the complaints, the circumstances or manner of the alleged assaults or the currency of the complaints were such as to suggest a pattern casting substantial doubt on the validity of the charges made by the victim in this instance”], appeal dismissed and cert denied 446 US 949 [1980]; People v McKnight, 55 AD3d 1315, 1316 [2008] [insufficient proof that alleged prior false accusations of sexual abuse were “suggestive of a pattern that casts doubt on the validity of, or bore a significant probative relation to, the instant charges” (internal quotation marks and citations omitted)], lv denied 11 NY3d 927 [2009]; compare People v Hunter, 11 NY3d 1, 6 [2008] [noting the similarities between recent, allegedly false accusations and those alleged against the defendant]). When determining whether a trial court abused its discretion, we must necessarily consider whether or not the document, if turned over, could have had any impact on the trial. Here, there can be no abuse of discretion as the information contained in the documents would not have been admissible, and we cannot envision how such information might have led to other material and admissible evidence.
Defendant also argues that County Court committed reversible error by precluding him from examining the victim about her hypersexuality. When defense counsel asked the victim on cross-examination if, at some point in time, she had been diagnosed as hypersexual, the court sustained the People’s objection as to form and directed counsel to rephrase the question. Counsel was unable to do so in a way to avoid objection and moved on. “Evidence of a victim’s sexual conduct shall not be admissible in a prosecution for [a sex] offense” unless it meets one of the enumerated statutory exceptions (CPL 60.42). Here, the victim’s mental health records indicate that she exhibits hypersexual behavior in that she is inappropriately focused on sex in conversation with others, and that such behavior is a symptom of her bipolar disorder. Defendant did not introduce medical evidence or expert testimony to establish that hyper-sexuality is a mental illness that would impact the victim’s credibility or control her behavior; indeed, all references to the victim’s “hypersexuality” in her medical history are to her wholly voluntary inappropriate, promiscuous behavior—conduct intentionally designed to shock and draw attention—which is *1008 precisely the kind of evidence the Rape Shield Law prohibits (see CPL 60.42; People v Simonetta, 94 AD3d 1242, 1246 [2012], lv denied 19 NY3d 1029 [2012]). Under these circumstances, we discern no abuse of discretion in the court’s limitation on the scope of cross-examination of the victim (see People v Halter, 19 NY3d 1046, 1049 [2012]; People v Simonetta, 94 AD3d at 1246; People v Scott, 67 AD3d 1052, 1054 [2009], affd 16 NY3d 589 [2011]; People v Passenger, 175 AD2d 944, 946 [1991]).
In any event, defendant was permitted to introduce evidence of the victim’s hypersexuality on the record through the testimony of the victim’s mother, defendant and Calhoun.[5] Accordingly, the jury had this information when assessing the evidence against defendant. We also hold that County Court’s refusal to permit defendant to cross-examine the victim’s mother regarding various events at which the victim exhibited undisciplined behavior, while permitting questions regarding the victim hearing voices, wandering around outside in her pajamas, sensing dead people and visualizing her deceased grandfather, demonstrated a sound exercise of discretion in controlling the scope of cross-examination (see People v Carter, 50 AD3d 1318, 1321 [2008], lv denied 10 NY3d 957 [2008]).
We turn next to defendant’s claim that he was deprived of the effective assistance of counsel and, in doing so, address several substantive arguments that defendant asserts on appeal that were not preserved by an appropriate objection at trial. To establish this claim, defendant must show that counsel failed to provide meaningful representation and that there is an “ ‘absence of strategic or other legitimate explanations’ for counsel’s allegedly deficient conduct” (People v Caban, 5 NY3d 143, 152 [2005], quoting People v Rivera, 71 NY2d 705, 709 [1988]).
Defendant asserts that counsel should have objected to the introduction of testimony from police officers that the victim reported being sexually assaulted on the basis that these hearsay statements improperly bolstered the victim’s testimony (see People v Buie, 86 NY2d 501, 510-511 [1995]; People v Cuba, 66 AD3d 1121, 1123 [2009]). Significantly, defendant does not directly dispute that the admitted statements fall within the prompt outcry exception to the hearsay rule (see People v Rosario, 17 NY3d 501, 511 [2011]; People v Perkins, 27 AD3d 890, 892-893 [2006], lvs denied 6 NY3d 897 [2006], 7 NY3d 761 [2006]) but, instead, argues the prejudicial impact of this evidence in light of the number of prompt outcry statements admit *1009 ted and County Court’s failure to provide a limiting instruction as to its relevance. Inasmuch as the outcry testimony was accurately limited to the fact that a complaint was made and the court gave an appropriate prompt outcry instruction in its charge to the jury (see CJI2d[NY] Prompt Outcry; People v Bernardez, 85 AD3d 936, 938 [2011], lv denied 17 NY3d 857 [2011]), we discern no significant error in counsel’s decision not to object to this testimony or ask for a limiting instruction.
Likewise, defense counsel did not err in failing to object to the introduction of evidence of the victim’s statements to medical personnel. These statements squarely fall within the medical records exception to the hearsay rule because they were germane to diagnosis and treatment (see People v Wright, 81 AD3d 1161, 1164 [2011], lv denied 17 NY3d 803 [2011]; People v Thomas, 282 AD2d 827, 828 [2001], lv denied 96 NY2d 925 [2001]; see also CPLR 4518; CPL 60.10). Accordingly, the testimony and records pertaining to the victim’s emergency room visit on the night of the rape were properly admitted (see People v Ortega, 15 NY3d 610, 617 [2010]; People v Wright, 81 AD3d at 1164).
We also discern no error in defense counsel’s failure to object to the introduction of evidence of defendant’s criminal history inasmuch as a Sandoval hearing was held prior to trial where County Court precluded inquiry into 22 of the 27 prior offenses proffered by the People. Additionally, the People did not exceed the scope of the court’s limited Sandoval ruling during defendant’s cross-examination, and the court informed the jury that it could only consider the crimes with regard to his credibility (see People v Nash, 87 AD3d 757, 759 [2011], lv denied 17 NY3d 954 [2011]). Likewise, although defense counsel did not object to the People’s use of defendant’s statement for the first time during his cross-examination, such objection would have been fruitless as the statement was admissible to impeach him (see People v Martin, 8 AD3d 883, 886 [2004], lv denied 3 NY3d 677 [2004]).
Defendant makes numerous other, specific objections to defense counsel’s choices in representing him. We have considered them carefully and find each to be the product of a legitimate trial strategy, or to concern matters outside the record, and, therefore, are more properly reviewed on a motion pursuant to CPL article 440 (see People v McCray, 96 AD3d 1160, 1161 [2012], lv denied 19 NY3d 1104 [2012]). Counsel zealously advocated for defendant, made appropriate pretrial motions, pursued a reasonable defense theory, thoroughly cross-examined witnesses and made appropriate evidentiary objections; thus, viewing the record as a whole, defendant received meaningful *1010 representation (see People v Benevento, 91 NY2d 708, 712 [1998]; People v Evans, 81 AD3d 1040, 1041 [2011], lv denied 16 NY3d 894 [2011]).
Many of defendant’s remaining contentions on appeal do not warrant extended discussion. His claim that bail was improperly denied is moot in light of his conviction and subsequent incarceration (see Matter of Varela v Stein, 37 AD3d 1001, 1001 [2007]). His contentions that County Court improperly denied his second request for new counsel, and that deficiencies existed in the grand jury proceedings, the felony complaint, the indictment and the presentence report lack a factual basis in the record. Defendant’s allegations of prosecutorial misconduct do not demonstrate a “ ‘flagrant and pervasive pattern’ of misconduct” warranting reversal (People v Hunt, 39 AD3d 961, 964 [2007], lv denied 9 NY3d 845 [2007], quoting People v McCombs, 18 AD3d 888, 890 [2005]).
Finally, we turn to defendant’s request that we modify his sentence on the basis that it is unduly harsh and excessive. Given the violent nature of this crime against a particularly vulnerable victim, defendant’s extensive criminal history— including three prior felonies and a prior sexual offense—and the fact that defendant’s own conduct prevented any argument for leniency to be made as he refused to permit counsel to speak on his behalf at sentencing or to address County Court himself, we cannot find “an abuse of discretion or extraordinary circumstances warranting reduction” (People v Walker, 266 AD2d 727, 728 [1999], lv denied 96 NY2d 909 [2001]; see People v Jones, 39 NY2d 694, 697 [1976]). Nor are we persuaded that the disparity between the ultimate sentence imposed and a very favorable plea offered prior to trial necessitates the conclusion that defendant was penalized for exercising his right to a trial where, as here, the attractive plea offer is easily justified by the fact that the People’s proof largely rested on the credibility of the victim, who was a troubled, emotional young woman (see People v Blond, 96 AD3d 1149, 1153-1154 [2012], lv denied 19 NY3d 1101 [2012]; People v Maldonado, 205 AD2d 933, 933 [1994] lv denied 84 NY2d 908 [1994]; compare People v Williams, 40 AD3d 1364, 1367 [2007], lv denied 9 NY3d 927 [2007]).
We have considered defendant’s remaining contentions and find them to be without merit.
Stein and Gariy, JJ., concur.

. A defendant is guilty of the crime of rape in the first degree “when he or she engages in sexual intercourse with another person: [b]y forcible compulsion” (Penal Law § 130.35 [1]). As no dispute exists that defendant and the victim engaged in sexual intercourse, the issue here devolves to whether such intercourse was consensual or by forcible compulsion, which may be by “use of physical force” or “a threat, express or implied, which places a person in fear of immediate death or physical injury to himself, herself or another person” (Penal Law § 130.00 [8]).

. In his pro se brief, defendant also challenges the legal sufficiency of the evidence. Although this argument was not preserved by his general motions to dismiss for failure to present a prima facie case (see People v Terry, 85 AD3d at 1486), we “ ‘necessarily review the evidence adduced as to each of the elements of the crimes in the context of our review of defendant’s challenge regarding the weight of the evidence’ for which there is no preservation requirement” (People v Newkirk, 75 AD3d 853, 855 [2010], lv denied 16 NY3d 834 [2011], quoting People v Caston, 60 AD3d 1147, 1148-1149 [2009] [citation omitted]).

. The vast majority of the documents disclosed were dated, revealing a picture of the victim’s mental health between the ages of 13 and 18. One of the documents disclosed contains an assessment of the victim taken on the day of the rape.

. The victim’s mental health records reveal a very troubled relationship with her father, who physically abused her during a limited amount of time during the victim’s lifetime—approximately six months when the victim was 13—when he resided with the family. The full extent of details of the abuse alleged by the victim are that he “tried to rape her,” describing that he “pinned her up against the wall in a sexual position and she can not recall how she got away.” Her mental health records do not contain any other details from the victim pertaining to sexual abuse or that she ever recanted her statements. The only suggestions that the allegation was false come from a mental health worker at a local childcare institution that was treating the victim when she was 13 who noted, without elaboration, that the allegation was “unfounded” and the mother’s reported opinion that the father never sexually abused the victim.

. Calhoun was even permitted to provide a layperson’s definition, explaining that hypersexual means “she [is] very hot in the pants.”